RECEIVED IN PRO SE OFFICE

AUG 0 7 2023

United States District Court

Eastern District New York

| | | |
|---|---|---|
| Sinvula Nalisa | ) | 23-cv-6021-LDH-LB |
| Plaintiff | ) | Case: |
| v. | ) | |
| City of New York; A Municipality | ) | |
| NYPD Officer Andrade #17196; in His Official | ) | |
| And individual capacaity | ) | |
| Victor Feraru; Private Citizen | ) | Judge: |
| 4 unknown NYPD police officers; In Their Official | ) | |
| And Invidual Capacity | ) | |
| Defendants | ) | |
| | ) | JURY TRIAL DEMAND |

## Verified Civil Rights Complaint

Now Comes Sinvula Nalisa ("Plaintiff"), in want of counsel, and submits the instant civil rights

complaint and in support thereof states the following:

### Jurisdiction and Venue

1. This court's jurisdiction is invoked pursuant to 42 U.S.C. 1983 insofar that the named defendants

   are individuals who violated Plaintiff's constitutional rights under color of state law.

2. Additionally, this court's jurisdiction is invoked pursuant to 42 U.S.C. 1981, 42 U.S.C. 1985, and

   28 U.S.C. 1331.

3. Plaintiff invokes this Court's pendant jurisdiction pursuant to 28 U.S.C. 1367 to hear state claims. Pendant or supplemental jurisdiction is appropriate insofar that the claims arise from the same events as the federal claims.

4. The venue is appropriate insofar that the alleged acts and omissions occurred within the territorial boundaries of the Eastern Federal District of New York City

## Parties

5. At all times relevant hereto, Plaintiff Sinvula Nalisa was an immigrant from Namibia who held the status of a permanent resident of the United States. Within the past year, Plaintiff gained his American citizenship. Plaintiff resides at 910 Brooklyn Ave, Brooklyn New York, 11203 where he has rented the building for approximately three (3) years.

6. At all times relevant hereto, the City of New York is a suable entity under 42 U.S.C. 1983. Plaintiff asserts a Monel claim against the City of New York insofar that *inter alia* the Cities failure to properly train and supervise their police officers directly lead to Plaintiff's injuries. Additionally, the city has adopted policies and procedures that are unconstitutional by virtue of the explicit approval by supervising officers of the unlawful entry of Plaintiff's residence.

7. At all times relevant hereto, Defendant Officer Andrade badge number 17196 is a citizen of the United States employed by the City of New York as a police officer. This Defendant participated in the unlawful entry of Plaintiff's residence in violation of the Constitution and the Fourth Amendment thereto.

8. At all times relevant hereto, Defendant unknown police officer is a citizen of the United States. This Defendant was the partner of Defendant Andrade badge number 17196. This Defendant was employed by the City of New York as a police officer. This Defendant participated in the violation of Plaintiff's Constitutional rights.

9. At all times relevant hereto, three of the unknown police officers were citizens of the United States and employed by the City of New York as police officers. These officers wore white shirt uniforms which is indicative of a supervisor capacity. These supervisors directly witnessed, participated, and approved the violations of Plaintiff's constitutional rights. As Supervisors, these Defendants' orders and approval of constitutional violations represent policy by the City of New York.

10. At all times relevant hereto Defendant Victor Feraru was a citizen of the United States and an attorney at law licensed by the State of New York. This Defendant's Brooklyn office is located at 238 Wilson Ave. #151, Brooklyn, New York 11237. This Defendant is liable insofar that he entered into a conspiracy with the Police Officers to deprive Plaintiff of his constitutional rights.

**Facts**

11. For approximately two (2) years prior to the complained of conduct, Plaintiff rented at 910 Brooklyn Ave. Brooklyn, New York, 11203.

12. Plaintiff is a responsible tenant who always paid his rent and never violated any of the terms of the rental contract.

13. On August 3, 2022, at approximately 1:00 p.m., Plaintiff received a phone call from his domestic assistant. Plaintiff was informed that a woman claiming to own the residence forced herself into the home while the domestic assistant was taking out the garbage.

14. Plaintiff immediately telephoned his attorney who instructed Plaintiff to call the New York Police Department ("NYPD") and report a trespassing as well as a breaking and entering. Plaintiff called the NYPD and reported the trespassing.

15. Approximately one hour later at 2:00 p.m. Plaintiff arrived at his residence with his girlfriend while Plaintiff viewed a marked NYPD squad car pull up.

16. Plaintiff viewed the landlady and Defendant Feraru at Plaintiff's doorway. These Defendants were not authorized to enter Plaintiff's home.  Plaintiff kept his residence locked and secured. During the course of this incident, Plaintiff observed Defendant Feraru and the landlady enter and exit his residence multiple times.

17. Defendant Andrade asked Plaintiff what was going on and Plaintiff explained that he lived at the residence and that Defendants Feraru and the landlady were trespassing and had entered Plaintiff's home illegally.

18. Defendant Andrade was joined by his apparent partner who did not identify himself but was dressed in a similar uniform as Andrade.

19. Defendant Andrade asked Plaintiff if he had proof that he was a lawful resident of the home. Plaintiff immediately produced his driver's license which indicated that Plaintiff's address was 910 Brooklyn Ave, Brooklyn New York, 11203.

20. Defendant Andrade told the Plaintiff to not go into his residence but ordered him to stay where he was at. At this point in time, Plaintiff was under the belief that he was detained because he was not free to enter his residence after proving that it is his.

21. Plaintiff heard the landlady inform Defendant Andrade that Plaintiff was a squatter and that he wasn't a lawful resident.

22. Plaintiff heard Defendant Feraru tell Defendant Andrade that Plaintiff was a squatter. Plaintiff heard Defendant Feraru tell Defendant Andrade that Feraru is a licensed attorney. On information and belief, the purpose of revealing his status as an attorney was to unlawfully influence Defendant Andrede

23. Defendant Andrede asked the landlady if she had proof that she was the lawful resident at the address of 910 Brooklyn Ave. Brooklyn, New York, 11203.

24. Defendant LANDLADY was unable to produce any proof that she was the lawful resident of 910 Brooklyn Ave. Brooklyn, New York 11203.

25. Immediately after this, Defendant Unknown Police officer who identified as Defendant Andrade's partner said, "I think I know what is going on here".

26. This Defendant did not elaborate on what he meant by this. Plaintiff construed it to be in favor of him and to mean that this Defendant sees that Plaintiff is being unlawfully kicked out of his home.

27. At this point, Defendant Andrade told Plaintiff that he was going to radio his supervisors to come to the scene.

28. On information and belief, Defendant Andrade is of Latin American Extraction while his partner is of Asian American extraction.

29. After some time had passed, unmarked squad cars pulled up to the residence, and three NYPD police officers stepped out.

30. Plaintiff viewed that these officers were wearing a different uniform than Defendants Andrade and his unknown partner.

31. These three unknown police officers were wearing white uniform shirts which were different than Officer Andrade and his unknown partner's dark uniformed shirt.

32. Plaintiff later learned that these white shirt officers were supervising officers working for the City of New York.

33. These three unknown Supervising Police Officer Defendants asked Plaintiff for his identification wherein Plaintiff proved that he is the lawful resident of 910 Brooklyn Ave. Brooklyn, New York 11203.

34. These three unknown supervising police officer Defendants told Plaintiff to stay where he was and that he could not enter his residence. Plaintiff continued to operate under the belief that he was arrested or detained.

35. At no time during the events did the landlady produce a signed court order stating that Plaintiff was to be evicted from his residence.

36. After this point, the three unknown supervising police officer Defendants approached Defendant Feraru and the landlady and spoke with Defendant Feraru and the landlady.

37. Plaintiff heard Defendant Feraru and the landlady talking with the Unknown three supervising police officer Defendants and telling them the Plaintiff is a squatter.

38. While these events are unfolding, individuals who are unknown to Plaintiff joined that landlady and Defendant Feraru. It appeared that these unknown individuals were friends or associates or either the landlady Defendant Feraru or both.

39. At this point it became apparent to Plaintiff that Defendant Feraru and the landlady had convinced the other Defendants that Plaintiff was a squatter.

40. Defendant Feraru, the landlady, and the 3 unknown supervising police officers entered Plaintiff's lawful residence without permission.

41. The Defendants unknown supervising police officers had proof that Plaintiff was the lawful resident of 910 Brooklyn Ave. Brooklyn, New York, 11203. Despite this evidence, the supervising officers deliberately entered Plaintiff's lawful residence without permission or legal justification.

42. At all times relevant hereto, Plaintiff's liberty was curtailed insofar that he was not allowed to enter his residence with the Defendants or observe them as they unlawfully searched his private residence.

43. On information and belief, these supervising officers discriminated against Plaintiff because he is of African extraction. It appears that the Defendant unknown supervising officers did not believe that Plaintiff could afford the residence on the basis of his race.

44. Defendants Officers Andrade and his unknown partner entered Plaintiff's residence as well without authorization. One officer was always with Plaintiff in order to prevent Plaintiff from entering his own residence.

45. At no point in time was Plaintiff allowed to enter into his lawful residence even after showing proof that he is a resident at the address of 910 Brooklyn Ave, Brooklyn, New York 11203.

46. The unknown individuals who appeared to be friends of either the landlady, Defendant Feraru or both entered Plaintiff's residence as well.

47. At no point in time did Plaintiff give anyone permission to enter his residence.

48. The five (5) Defendant police officers allowed multiple individuals to trespass on Plaintiff's residence. These individuals were never asked to verify that 910 Brooklyn Ave. Brooklyn, New York 11203 is their residence.

49. A reasonable person could conclude that the NYPD was holding an open house in Plaintiff's residence, and everyone was welcome except for the Plaintiff.

50. After some time had passed, Plaintiff saw these same Defendants exit the residence through a different door. This confused Plaintiff because this door was secured and only Plaintiff had the key.

51. At some point in the future, Plaintiff saw that the secured door was broken. On information and belief, Defendant Feraru, the landlady, and the unknown police officers forcefully broke the door.

52. Upon exiting Plaintiff's residence, the Defendant three unknown supervising police officers left the scene.

53. After the departure of their supervisors, Defendant Officer Andrade told Plaintiff that he was not allowed to enter the residence of 910 Brooklyn Ave. Brooklyn, New York 11203. Defendant Andrade told Plaintiff that, "If I ever see you around this house again, I will arrest you".

54. On information and belief, the Defendant three unknown supervising police officers instructed Defendant Andrade and his unknown partner to order Plaintiff to leave the area and to threaten him with arrest if they see him at the residence of 910 Brooklyn Ave. Brooklyn, New York 11203 again.

55. Defendants Officer Andrade and his unknown partner refused to allow Plaintiff to enter the residence to get any of his personal affects. These Defendants refused to leave Plaintiff's residence until Plaintiff returned to his car and drove away.

56. Plaintiff's girlfriend was with him the entire time and witnessed these events.

57. Plaintiff was evicted from his residence by the named Defendants without a proper court order or any due process.

58. For approximately three months, Plaintiff was unable to access his lawful residence or access his personal affects that were contained therein.

59. During this three month period, Plaintiff appeared in housing court regarding his residence. The presiding judge ruled in favor of Plaintiff.

60. Plaintiff received a court order and was able to finally access his lawful residence.

61. Upon entering his residence, Plaintiff discovered that his property was missing, and that significant damage had been done to the residence. This includes but is not limited to the breaking of the door which the Defendants exited out of.

62. Plaintiff had property that held significant value. Plaintiff was never able to recover his property.

63. Plaintiff immediately made a FOIL request to get the body camera footage from the complained of event.[1]

64. To date, the Defendant City of New York has violated their own policies and procedures by delaying release of the body camera footage.

65. On information and belief, supervisors and policy makers in the NYPD and City of New York are actively obstructing justice by denying Plaintiff access to the body camera footage.

66. On information and belief, it is a custom and practice by Defendant City of New York to obstruct efforts to obtain body camera footage that demonstrates police misconduct.

67. This apparent deliberate obstruction of justice is indicative of a "code of silence" among the Defendant City of New York and its employees to coverup police misconduct instead of addressing it and resolving it. Defendant City of New York is an active enabler of police misconduct and racial discrimination.

### Count 1: Violation of 4th Amendment
### of the United States Constitution
### All Defendants

68. Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67.

69. At all times relevant hereto, Plaintiff had a constitutional right to be free from unlawful searches and from unlawful arrests.

70. Plaintiff never gave the named Defendants permission to enter his lawful residence nor did he give the landlady permission to enter. The law doesn't allow the landlady to enter Plaintiff's home under the circumstances that were present on the day in question.

---

[1] https://a860-openrecords.nyc.gov/request/view/FOIL-2022-056-19422

71. Despite verifying of Plaintiff's government issued identification that the address of 910 Brooklyn Ave. Brooklyn, New York 11203, the Defendant Police officers knowingly, intentionally, and maliciously entered Plaintiff's residence without a search warrant or any other lawful reason.

72. Defendant Feraru knowingly entered Plaintiff's home without permission or authority. On information and belief, this Defendant entered into an agreement with the Defendant police officers to violate Plaintiff's federally protected constitutional rights.

73. In compounding these unlawful acts, the Defendant Police officers detained Plaintiff and prevented him from entering his lawful home. At this point in time, Plaintiff was not free to enter his own home and was thus under the impression that he was under arrest.

74. Defendant police officers knowingly, willfully, and intentionally placed Plaintiff under a false arrest by actively obstructing him from entering his lawful residence and restraining his liberty without probable cause.

75. On information and belief, Defendant police officers discriminated against Plaintiff because he is of African extraction. This is supported by the fact that the Defendant Police officers did not believe that Plaintiff was the lawful resident despite having government issued identification that proves he is the lawful resident. Instead, the Defendant police officers choose to believe a Caucasian woman who could not provide any proof of residency as Plaintiff had done.

76. On information and belief, all the named Defendants operated under a prejudice against individuals of African extraction and discriminated against Plaintiff.

77. By engaging with the Defendant Police officers in violating Plaintiff's constitutional rights under color of state law, Defendant Feraru is liable under 42 U.S.C.1983.

78. All the Defendants are jointly and severally liable due to their knowing and willful decision to violate Plaintiff's constitutional rights.

79. These Defendants acted in joint concert with one another.

80. These Defendants are not entitled to qualified immunity insofar that a violation of a fundamental constitutional right is not covered by qualified immunity.

81. On information and belief, racial discrimination was the driving force behind the Defendants violations of Plaintiff's constitutional rights.

82. Plaintiff asserts that Defendant City of New York is liable pursuant to a Monel claim. This will be further explained in the appropriate count.

**Count 2: 14th Amendment Due Process**

**And Equal Protection Violation**

**All Defendants**

83. Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67.

84. At all times relevant hereto, Plaintiff enjoyed the constitutional right of equal protection under the law.

85. At all time relevant hereto, Plaintiff enjoyed the constitutional right to life, liberty and property and that deprivation cannot occur without due process of law.

86. At all times relevant hereto, Plaintiff enjoyed the constitutional right to be free from discrimination based on his race.

87. Plaintiff, acting under advice of counsel, contacted the NYPD due to the unlawful entry of his home by the landlady.

88. Plaintiff's constitutional right to, inter alia, liberty was violated without due process of law when he was detained by the five (5) Defendant police officers without probable cause or any lawful justification.

89. Plaintiff's constitutional right to, inter alia, property was violated without due process of law when the five (5) Defendant police officers entered Plaintiff's private residence without probable cause or any other lawful justification.

90. Plaintiff's constitutional right to property was violated without due process of law when the five (5) Defendant police officers ordered Plaintiff to not enter his residence, then subsequently threatened Plaintiff with arrest if he they caught him around the residence of 910 Brooklyn Ave. Brooklyn, New York, 11203.

91. Every day for approximately ninety (90) days, Plaintiff's constitutional right to property was violated without due process of law when the Defendant police officers, on threat of arrest, ordered Plaintiff to stay away from his own private residence.

92. Instead of protecting and serving Plaintiff, the Defendant police officers discriminated against Plaintiff due to his race. These Defendants protected and served an individual who had committed a burglary and a trespassing. On information and belief, the NYPD never took action against the landlady for burglary and trespassing because she enjoys the privilege extended to her race by the Defendant police officers.

93. Plaintiff's constitutional rights as well as his human rights were violated by the named Defendants based upon Plaintiff's race.

94. On information and belief, Defendant Police officers selectively enforce the constitutional right to be free from unlawful searches and arrests based upon race.

95. Because of this selective enforcement, Defendant police officers choose not to extend constitutional protections to Plaintiff due to the fact that he is of African extraction.

96. All the Defendants are jointly and severally liable due to their knowing and willful decision to violate Plaintiff's constitutional rights.

97. These Defendants acted in joint concert with one another.

98. These Defendants are not entitled to qualified immunity insofar that a violation of a fundamental constitutional right is not covered by qualified immunity.

99. By engaging with the Defendant Police officers in violating Plaintiff's constitutional rights under color of state law, Defendant Feraru is liable under 42 U.S.C.1983.

100.  Plaintiff asserts that Defendant City of New York is liable pursuant to a Monel claim. This will be further explained in the appropriate count.

Count 3: Conspiracy to Violate Plaintiff's
Constitutional Rights. Defendant Feraru

101.  Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67

102.  At all times relevant hereto, Plaintiff enjoyed the free exercise and protections afforded by the United States Constitution under 42 U.S.C. 1985

103.  At all times relevant hereto, Plaintiff held a federally protected right to be free from unlawful agreements made by private individuals to violate his constitutional rights on the basis of his race.

104.  Defendant Feraru and the landlady entered into a private agreement to unlawfully enter Plaintiff's lawful residence.

105.  Defendants Feraru and the landlady conspired with the other Defendants to commit the following acts

a. Trespass

b. Falsely imprison.

c. Falsely arrest.

d. Violate equal protection under the law.

e. Discriminate against Plaintiff because of his race.

106.  Being an attorney at law, Defendant Feraru used his status to influence the other to violate Plaintiff's right to equal protection under the law on the basis of Plaintiff's race.

107.     Being an attorney, Defendant Feraru knew, should have known, and had a duty to know that he was violating multiple laws as well as the United States Constitution.

108.     This Defendant acted knowingly, willfully, and maliciously against the Plaintiff on the basis of his race.

109.     This Defendant acted in joint concert with the other named Defendants.

**Count 4 State Claim**

**False Imprisonment: Defendants Andrade**

**4 Other Unknown Police Officers**

110.     Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67.

111.     At all times relevant hereto, Plaintiff enjoyed the right to be free from false imprisonment.

112.     By virtue of not allowing Plaintiff to enter his own private residence, Defendant Andrade and the other unknown Police officers restrained Plaintiff's freedom.

113.     These Defendants had no lawful or reasonable basis to detain Plaintiff other than he was of African extraction.

114.     Plaintiff had called the police to report a breaking and entering on his own residence. Plaintiff demonstrated that the residence was his by virtue of producing government issued ID with the address of 910 Brooklyn Ave. Brooklyn, New York, 11203.

115.     Instead of conducting a neutral investigation, Defendant Andrade and the other unknown police officers unlawfully detained and falsely imprisoned Plaintiff while the landlady and Defendant Feraru trespassed on Plaintiff's property with the explicit approval of NYPD officers and supervisors.

116.     The fact pattern as alleged above clearly demonstrates the following:

   a.   The named Defendants intended to detain Plaintiff

    b.   Plaintiff was aware that he was being unlawfully confined

    c.   Plaintiff did not consent to being confined and,

    d.   The confinement was not otherwise privileged.

117.      These Defendants acted in joint concert with one another.

118.      These Defendants both explicitly and implicitly agreed to commit the tort of false imprisonment.

119.      Plaintiff asserts that Defendant City of New York is liable pursuant to a Monel claim. This will be further explained in the appropriate count.

120.      These Defendants are not entitled to qualified immunity.

**Count 5: Monel Claim**

**Defendant City of New York**

121.      Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67.

122.      Pursuant to established United States Supreme Court case law, the City of New York is a suable entity for purposed of 42 U.S.C. 1983.

123.      The constitutional violations that Plaintiff suffered, were a direct result of *inter alia* failure to properly and adequately train and supervise the employees, unconstitutional policies or customs among the NYPD, and deliberate indifference to Plaintiff's constitutional rights.

124.      Plaintiff asserts that the circumstances surrounding the events that took place satisfy the criteria for the "single-incident theory" to demonstrate deliberate indifference to constitutional rights by the City of New York.

125.      It is "Patently Obvious" that a private citizen has the right to be free from invasion of his private residence by Police Officers without lawful justification.

126.     These Defendant police officers knew that they didn't have a warrant or permission by the proven homeowner (i.e., Plaintiff) to enter the residence of 910 Brooklyn Ave. Brooklyn New York, 11203.

127.     It is "Patently obvious" that a private citizen has the right to be free from an unlawful arrest. These Defendant Police officers knew that they did not have probable cause to physically detain Plaintiff and prevent him from entering his residence but made the deliberate and conscious choice to violate his fundamental rights.

128.     It is "Patently obvious" that a private citizen who is a racial minority has the right to equal protection under the law and be free from racial discrimination. These Defendant Police officers made the conscious choice to violate Plaintiff's right to equal protection because of his race.

129.     These Police officers made the deliberate and conscious to violate Plaintiff's fundamental rights with impunity.

130.     These events satisfy the "single-incident theory" because the circumstances surrounding the case shocks the conscience.

131.     The City of New York knows, should know, and has a duty to know that's it's critical that police officers understand the constitutional limits of searches of private residences, the limits regarding curtailing the liberty of a private citizen, and the meaning of equal protection under the law.

132.     The City of New York knows, should know, and has a duty to know that their police force will encounter individuals of different races and ethnic origins and that these individuals enjoy the same rights and privileges as a Caucasian resident.

133.    The cities failure or refusal to adequately train and supervise its police force to avoid patently obvious violations of fundamental and constitutional rights amounts to deliberate indifference to Plaintiff's constitutional rights.

134.    If the City of New York had adequately trained and supervised their police force, it would have made it much easier for the Defendant police officers to make decisions that conform with the constitution.

135.    By failing to train their police force regarding constitutional safeguards, it is highly predictable that this problem will occur continuously.

136.    The fact that two (2) police officers in addition to three (3) supervising officers believed that their course of action followed the law and the NYPD training, policies, and procedures, is evidence that the City of New York does not properly train the employees.

137.    Any training that the Defendants may have received regarding searches of private residences, probable cause for arrests or racial discrimination is so deficient that it constitutes no training at all. The patently obvious violations of Plaintiff's constitutional rights is demonstrative of a complete lack of training.

138.    Defendant unknown supervising police officers are representatives of the official policies and customs as set forth by the City of New York regarding policing.

139.    Defendant City of New York, created the role of supervisors in the police force to act as an extension of its own supervisory role. As individuals entrusted with a supervisory position, they are charged with knowing the law and ensuring that Defendant Andrade and his unknown partner do not violate *inter alia* federally protected rights. Instead, these supervisors became enablers of police misconduct.

140.    As supervising police officers, these three (3) Defendant Supervising police officers were entrusted with final decision making authority at the time Plaintiff's constitutional rights were violated.

141.    These supervising police officers not only explicitly approved officer Andrade and his partner's unlawful entry into Plaintiff's home and Plaintiff's unlawful detainment, but actively participated in the violations of Plaintiff's fundamental rights.

142.    The actions of these unknown supervising police officer Defendants constitutes official policy and customs of the NYPD and the Defendant City of New York.

143.    These official policies or customs set forth by the Defendant three (3) unknown police officers, directly caused and contributed to the violations of Plaintiff's constitutional rights.

144.    If the Defendant three (3) unknown police officers set forth official policies or customs that conformed with the constitution, Plaintiff would not have suffered any deprivations of his constitutional rights. These customs and policies as set forth by the City of New York caused the violations of Plaintiff's constitutional rights.

145.    The fact that three (3) supervising police officers approved the violations of Plaintiff's fundamental rights demonstrates that customs and policies exist that are not only deliberately indifferent to fundamental constitutional rights but promote the violations of fundamental constitutional rights.

146.    On information and belief, the explicit approval and participation by the three (3) Defendant Supervising police officers is common practice in the NYPD to the point that it is a custom among supervising police officers to not only participate in the misconduct but to cover it up and obstruct justice.

147.    These three (3) Defendant supervising police officers had a duty to initiate disciplinary proceedings against Defendants Andrade and his unknown partner. Not only did these

Defendants fail to take corrective action regarding police misconduct, they actively participated in and covered up the misconduct.

148.     The City of New York recently agreed to "Clarify existing policy[2]" in a mass settlement regarding illegal detainment. This occurred around the same time as Plaintiff suffered his unconstitutional treatment. These cases are similar insofar that they both involve unlawful detainment. Plaintiff was unlawfully detained by all five (5) Defendant Police Officers because he was explicitly ordered to not enter his residence. These Defendants did not have probable cause or any other legal reason to detain Plaintiff.

149.     Further evidence exists demonstrating that the City of New York has a systemic and rampant history of violating constitutional rights. In the calendar year of 2022, the same year as Plaintiff suffered his constitutional violations, the City of New York paid 121 million dollars in settlements for violations of constitutional rights. [3]

150.     The City of New York is aware that there are significant deficiencies in their policies by virtue of their own words in commenting on settlements in addition to the amount of money that was paid. While the City may attempt to avoid Monel liability by refusing to acknowledge fault in the settlements, there must come a point where a reasonable person can infer that there are serious issues in the training of the police officers.

151.     Plaintiff respectfully asserts that any defense that the Defendant City of New York did not admit liability in these settlements amounts to abuse of process. By virtue of the dramatic dollar amount of total settlements creates a *prima facia* case that there are serious issues with the NYPD that aren't being addressed by the policy makers.

---

[2] https://www.nytimes.com/2022/12/16/nyregion/nypd-warrant-settlement.html
[3] https://www.nytimes.com/2023/02/02/nyregion/new-york-police-department-misconduct-settlements.html

152.     On information and belief, there exists multiple complaints against the Defendant police officers, by other citizens who have experienced violations of their fundamental rights. Despite these complaints, the City of New York turned a blind eye to the obvious deficiencies in their training and supervising programs.

153.     The fact that the Defendant City of New York violates their own open records policies and procedures by denying Plaintff access to the body camera is part of a widespread custom and policy of the Defendant City of New York to obstruct access to body camera footage.

154.     On November 5, 2021, the inspector general for the Defendant City of New York published a report on the availability of body camera footage by the NYPD.

155.     The inspector general found that the NYPD's policies and procedures are problematic and that it often unreasonably delays access to body camera footage to the Civilian Complaint Review Board ("CCRB"), the Commission to Combat, Police Corruption ("CCPC"), and the City's Commission on Human Rights ("CCHR").[4]

156.     It is not surprisingly that a private citizen such as Plaintiff has difficulty accessing body camera footage of the events that occurred at his private residence since agencies charged with investigating police misconduct are similarly obstructed.

157.     On information and belief, it is a policy and a custom of Defendant City of New York to coverup police misconduct by *inter alia* refusing to release body camera footage pursuant to open records requests.

158.     Defendant Andrade has been the subject of multiple investigations regarding *inter alia* abuse of authority. While none of these complaints were substantiated, it is likely due to the fact that the investigations were obstructed by the lack of body camera footage.

---

[4] https://s3.documentcloud.org/documents/21103867/nypd-bwc-report-ig.pdf

159.     Defendant City of New York is deliberately indifferent to Defendant Andrade's history of allegations regarding abuse of authority because the City of New York has polices and procedures that protect and enable Defendant Andrade's unconstitutional conduct.

160.     On information and belief, the remaining four (4) unknown police officer Defendants have a history of misconduct including but not limited to abuse of authority and constitutional violations but enjoy the same protections offered by Defendant City of New York.

161.     On information and belief, Defendant City of New York, deliberately and consciously obstructs investigations in order to subsequently claim ignorance to any deficiencies within their training programs.

162.     On information and belief, this widespread policy and / or custom of obstructing justice is the same policy and / or custom that the three (3) unknown supervising police officers were operating under when approved and participated in the violations of Plaintiff's constitutional rights.

163.     The existence of a "code of silence" and the guarantee of protection by obstructing release of body camera footage, enables police misconduct and specifically the violations of Plaintiff's constitutional rights.

164.     In a published article by ProPublica entitled, "Police Watchdog Calls for Full Access to Body Cam Footage. The NYPD Says No[5]", it was demonstrated that the Defendant City of New York will deliberately lie that no body camera footage exists.

165.     It is obvious that a policy and custom exists in the Defendant City of New York that obstructs public access to body camera footage. This policy and custom directly lead to the violations of Plaintiff's constitutional rights insofar that the Defendant five (5) police officers

---

[5] https://www.propublica.org/article/police-watchdog-calls-for-full-access-to-body-cam-footage-the-nypd-says-no

engage in misconduct knowing that their actions will be covered up and enabled by Defendant City of New York

166.    Plaintiff asserts that Defendant City of New York is liable under Monel for *inter alia* a failure to train as well as a failure to supervise. Plaintiff asserts that these are two different claims with different standards. Plaintiff respectfully objects to combining these two elements as one claim.

167.    Plaintiff has alleged facts that allow a reasonable inference that there are deficiencies in the training programs that are deliberately indifferent to Plaintiff's constitutional rights.

168.    On information and belief, discovery will demonstrate that these five (5) Defendant Police officers have previously engaged in unconstitutional conduct which were the subjects of complaints and / or litigation.

## Count 6: State Claim Intentional Infliction of Emotional Distress
### All Defendants

169.    Plaintiff incorporates by reference and sets forth verbatim paragraphs 1-67.

170.    At all times relevant hereto, Plaintiff enjoyed the right to be free from the tort of intentional infliction of emotional distress.

171.    The complete disregard for Plaintiff's constitutional rights by Defendant police officers who have sworn an oath to uphold the law constitutes outrageous conduct necessary to satisfy the first element of a claim of intentional infliction of emotional distress claim.

172.    The Defendants racial discrimination and violation of Plaintiff's constitutional rights on the basis of his race constitutes outrageous conduct necessary to satisfy the first element of intentional infliction of emotional distress claim.

173.     Defendant Feraru's conscription of the Defendant five (5) police officers to violate

Plaintiff's constitutional rights constitutes outrageous conduct necessary to satisfy the first

element of intentional infliction of emotional distress.

174.     These Defendants knew, should have known, and had a duty to know that their actions

would cause severe emotional distress to the Plaintiff.

175.     The violations of Plaintiff's constitutional rights on the basis of his race is the direct

cause of the emotional distress.

176.     As a results of the Defendant's actions, Plaintiff suffered severe emotional distress.

177.     These Defendants acted in joint concert with one another

178.     These Defendants are not entitled to qualified immunity.

### Count 7: State Claim Negligence

### Defendant Andrade and Four (4) Unknown NYPD Officers

179.     At all times relevant hereto, Defendants Andrade and the four (4) unknown NYPD police

officers owed Plaintiff a duty of care.

180.     As police officers, these Defendants owed Plaintiff a duty to protect and to serve as well

as, uphold the constitution.

181.     Instead of following their oath, these Defendants breached their duty by violating

Plaintiff's fundamental constitutional rights.

182.     This breach of duty caused Plaintiff to be unlawfully displaced from his residence for

approximately 90 days as well as the destruction and or missing property.

183.     The damages Plaintiff suffered to his property as well as his constitutional rights is a

direct result of the Defendant's actions.

### Conclusion

Plaintiff has clearly set forth statements of fact that demonstrate that Defendants Andrade and 4 unknown NYPD police officers violated Plaintiff's constitutional rights under color of law. The facts of the case clearly set forth that Defendant Feraru conscripted the Defendant police officers to violate Plaintiff's constitutional rights by knowingly lying to the Defendant police officers that Plaintiff was a squatter. These Defendants curtailed Plaintiff's liberty without lawful justification, knowingly entered his private residence without lawful justification, and discriminated against Plaintiff due to his race.

The wanton and malicious violation of Plaintiffs fundamental constitutional rights with the direct participation and approval by supervising police officers satisfies the "single incident theory" to establish municipal liability by the City of New York. Additionally, Plaintiff satisfies the other ways in which the City of New York is liable. The explicit approval and participation by supervising police officers in the misconduct constitutes a policy or custom adopted by policymakers. This custom or policy directly lead to the violation of Plaintiff's constitutional rights. It is Plaintiff's understanding that at this stage of the litigation that his burden is to assert facts that allow a reasonable inference of a deficiency in the Cities training program that rises to the level of deliberate indifference to Plaintiff's rights Plaintiff has done so.

Plaintiff does not have formal legal training and invokes the United States Supreme Court's protection given to pro se litigants in Haines v. Kerner 404 U.S. 519. Any perceived deficiencies are due to Plaintiff's lack of legal training and respectfully asks this court for an opportunity to cure any identified defects. Plaintiff believes that he has brought a meritorious complaint

### Verification

Plaintiff certifies and affirms pursuant to 28 U.S.C. 1746 that the above statements of fact are true and correct and that any statements made on information and belief are set forth in good faith and Plaintiff believes them to be true.

Plaintiff prays that this honorable court enter a judgement in his favor and order the following:

1. Compensatory damages in an amount to be determined at a later date.

2. Punitive damages in an amount to be determined at a later date.

3. Declaratory relief

4. Injunctive relief and,

5. Any other relief that Plaintiff is entitled to, and this court determines to be fair and just.

Respectfully submitted.

Sinvula Nalisa                                    07/19/2023

                                                  Date

RECEIVED IN PRO SE OFFICE

AUG 07 2023

## Sinvula Nalisa
## 910 Brooklyn Ave
## Brooklyn, NY, 11203



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 07 2023 ★
BROOKLYN OFFICE

To:

Clerk's Office

Eastern District New York

225 Cadman Plaza East

Brooklyn, NY 11201                                      7-27-2023

Re: <u>Verified Civil Rights Complaint Filing with Civil Cover Sheet</u>

Dear Clerk,

    Enclosed is a pro se civil rights complaint I am filing with a civil cover sheet. I understand that there is a filing fee and could you please notify me of the amount that I owe and what methods of payment are acceptable. I am not formally trained in the law and I am not familiar with the court rules regarding the amount of copies I need to supply the court. I have provided three copies of the complaint and civil cover sheet. Included is a pre-paid first class addressed envelope. Could you please send me a file stamped copy of the complaint so that I can serve the known Defendants with requests for waiver of service. Thank you for your time an helpfulness. If I am forgettinig anything, please let me know and I will provide you with what is needed.

Respectfully Submitted

*Sinvula Nalisa*

Sinvula Nalisa

<u>7/31/2023</u>

Date

Sinvula Nalisa
910 Brooklyn Avenue
Brooklyn, NY   11203



USPS TRACKING® NUMBER

9505 5066 7506 3217 0751 53



U.S. POSTAGE
$12.45
RDC 01
60056
Date of sale
08/05/23
02
9815300954



PRIORITY ★ MAIL ★

TRACKED
★ ★ ★
INSURED
★

UNITED STATES
POSTAL SERVICE®

For Domestic and International Use    Label 107R, May 2014

TO:

Clerk's Office
United States District Court
Eastern District of New York
225  Cadman Plaza East
Brooklyn, NY   11201